UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

PAMELA LYNNE DOBBS,

        Plaintiff,

  -against-

ALFRED JOHN DOBBS, II,

        Defendant.

------------------------------------------------------------X

REPORT &
RECOMMENDATION
06 Civ. 6104 (KMK)(MDF)

TO: THE HONORABLE KENNETH M. KARAS, U.S.D.J.

Plaintiff Pamela Lynne Dobbs brings this action in diversity against Defendant Alfred John Dobbs II, alleging claims for the creation of a constructive trust, conversion, fraud, intentional infliction of emotional distress, and negligent infliction of emotional distress. Currently pending before the Court is Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56 (Doc. #'s 92-99, 102-110). For the reasons that follow, I respectfully recommend that your Honor grant in part and deny in part Defendant's motion.

## BACKGROUND

Plaintiff and Defendant are siblings and the children of Dr. Alfred John Dobbs. Def.'s Supplemental Statement of Material Facts Not in Dispute ("Def.'s Rule 56.1 Statement") ¶ 1. Plaintiff lives in Connecticut, Def.'s Rule 56.1 Statement ¶ 2, and Defendant lives in New York. *Id.* ¶ 9. Dr. Dobbs lived in Rochester, New York until his death on September 13, 2005. *Id.* ¶ 10. On March 13, 2005, Dr. Dobbs was admitted to Strong Memorial Hospital. *Id.* ¶ 54. He was

diagnosed with glioblastoma multiforme, a type of cancerous brain tumor, and was advised that it was terminal. *Id.* ¶¶ 13, 55. On March 30, 2005, Dr. Dobbs moved into a nursing facility, The Highlands at Brighton, where he lived until his death. *Id.* ¶ 56. Prior to the diagnosis, Dr. Dobbs had been living a self-sufficient, active life, maintaining his license to practice medicine, and driving himself around as necessary. *Id.* ¶ 14. He had maintained his own home, made his own financial decisions, and had been involved with the U.S. Coast Guard Auxiliary stationed in Rochester. *Id.* ¶ 15.

Dr. Dobbs was initially reluctant to tell his children, Pamela, Alfred, and another daughter named Ellen, about his illness. *Id.* ¶ 59; Pl.'s Statements of Facts in Dispute ("Pl.'s Rule 56.1 Statement") ¶ 36. When he first contacted Defendant in April 2005, Dr. Dobbs made Defendant promise not to tell Plaintiff or Ellen about his illness. Def.'s Rule 56.1 Statement ¶¶ 61, 63; Pl.'s Rule 56.1 Statement ¶ 38. In May 2005, however, Dr. Dobbs told Defendant that he wanted to see Plaintiff. Def.'s Rule 56.1 Statement ¶ 64; Pl.'s Rule 56.1 Statement ¶¶ 38, 40. In the beginning of June 2005, Defendant called Plaintiff and told her about their father's illness. Def.'s Rule 56.1 Statement ¶ 65; Pl.'s Rule 56.1 Statement ¶ 41. Soon thereafter, Plaintiff traveled up to Rochester. Pl.'s Rule 56.1 Statement ¶ 41. The parties dispute whether Plaintiff was allowed to visit Dr. Dobbs at the nursing facility unless Defendant was present. *Compare* Def.'s Rule 56.1 Statement ¶ 62 *with* Pl.'s Rule 56.1 Statement ¶¶ 39, 43, 44. Plaintiff also believed that she could not get information about Dr. Dobbs without Defendant, and she claims that by the time she found out about Dr. Dobbs' illness in June 2005, he was no longer able to engage in telephone conversations, so she could not call him. Pl.'s Rule 56.1 Statement ¶¶ 45, 46. After Dr. Dobbs died, Defendant called Plaintiff to tell her. Def.'s Rule 56.1 Statement ¶ 79. Defendant claims that he invited Plaintiff to go to

Rochester, New York to view Dr. Dobbs' body before it was cremated, Def.'s Rule 56.1 Statement ¶ 80, but Plaintiff claims she did not hear from Defendant about their father's death until after the body had already been cremated. Pl.'s Rule 56.1 Statement ¶ 51.

Plaintiff suffers from clinical depression, for which she has been seeing a psychiatrist for a number of years. Def.'s Rule 56.1 Statement ¶¶ 3-4; Pl.'s Rule 56.1 Statement ¶ 1. Aside from receiving SSI benefits for a few years back in the late 1970's, Plaintiff has been receiving government disability benefits, both Medicaid and Social Security Disability, since 1996. Pl.'s Rule 56.1 Statement ¶ 3; Def.'s Rule 56.1 Statement ¶ 6. Dr. Dobbs knew that Plaintiff was receiving public assistance. Def.'s Rule 56.1 Statement ¶ 6. While he was alive, Dr. Dobbs provided financial support to Plaintiff by paying her rent, paying her car insurance, paying for repairs to her car, and providing her with a car. Pl.'s Rule 56.1 Statement ¶ 65; *see also* Def.'s Rule 56.1 Statement ¶ 48 (Dr. Dobbs and Defendant held joint title in a Mazda which was gifted to Plaintiff in March 2003). At issue in this litigation are Dr. Dobbs' assets and various arrangements he made concerning those assets in the years preceding his death.

In May 1997, an account application was filled out, establishing a V.I.P. Asset Management Account, number CM1-071161, with Chase Investment Services Corp. *See* Affirmation in Opp'n to Mot. ("Levine Aff.") Ex. J. On the application, signed by both Dr. Dobbs and Defendant, a box is checked off indicating that it is a joint account, with ownership vested in them as joint tenants with rights of survivorship. *Id.* Similarly, in November 1999, an account application was filled out, establishing a second V.I.P. Asset Management Account, number CM1-077470, with Chase Investment Services Corp. *See* Levine Aff. Ex. M. Again, the application is signed by both Dr. Dobbs and Defendant, and a box is checked off indicating that it is a joint account, with ownership

3

vested in them as joint tenants with rights of survivorship. *Id.* As of August 31, 2005, just before Dr. Dobbs died, the portfolio value of account number CM1-071161 was $827, 516.47, and the portfolio value of account number CM1-077470 was $828,145.68. Aff. of Igor Yurovskiy Exs. C & D.

In July 2000, an account application was signed by Dr. Dobbs and Defendant, establishing a joint account with right of survivorship with Bear Stearns Securities Corp. *See* Gregory J. McDonald Aff. in Supp. of Mot. ("McDonald Aff.") Ex. M.[1] In 2005, the assets of the Bear Stearns account were transferred to Chase account number CM1-077470. Def.'s Rule 56.1 Statement ¶ 36. Two HSBC (formerly Marine Midland Bank) accounts, one checking and one savings, were opened on April 17, 1997 and April 23, 1997 respectively, *see* McDonald Aff. Ex. N, and Defendant claims that on these accounts, he and his father were joint tenants with rights of survivorship. Def.'s Rule 56.1 Statement ¶¶ 38-39. Dr. Dobbs also had a safe deposit box at HSBC, and in February 1980, he authorized Defendant to have access to the safe deposit box and gave him a key to the box. Def.'s Rule 56.1 Statement ¶ 41. On August 20, 2003, Dr. Dobbs opened a deposit account with Charter One Bank (which later became Citizens Bank). McDonald Aff. Ex. Z. On October 17, 2003, he changed the account to a joint account with rights of survivorship in Defendant. *Id.*

Defendant was the sole beneficiary of Dr. Dobbs' two Veteran Administration life insurance policies and received all of the proceeds therefrom upon Dr. Dobbs' death. *See* McDonald Aff. Ex. R. He was named beneficiary of at least one of the policies in 1997. Alfred John Dobbs II Aff. in Supp. of Mot. ("A.J. Dobbs Aff." [Doc. #28]) Ex. I (annual statement for policy V 1716 04 82). As

---

[1] This account was created when proceeds from a pre-existing joint account with rights of survivorship was transferred from Concord Brokerage. *See* McDonald Aff. Ex. O (Responses to Interrogatories 4e and 5).

of at least the last quarter of 2002, Defendant was the sole named beneficiary of Dr. Dobbs' Individual Retirement Account ("IRA") with Smith Barney, McDonald Aff. Ex. V, and in November 2005, he received the proceeds of that account. *Id.* Ex. S.

Finally, since October 27, 1997, Dr. Dobbs and Defendant were joint owners of a 1991 Volvo and a 1977 Mercedes. A.J. Dobbs Aff. Exs. K & L. They were also joint owners of the 1994 Mazda gifted to Plaintiff in March 2003, as noted above.

It is Plaintiff's contention that these joint account and joint ownership arrangements, as well as naming Defendant the sole beneficiary under the life insurance policies and IRA, were intended as a convenience to protect Dr. Dobbs' money and assets from attachment by his estranged, mentally ill wife, Caral Dobbs. *See* Pl.'s Rule 56.1 Statement ¶¶ 16, 19, 21-24, 26-34, 53, 55-56.

In 1989, Dr. Dobbs executed a Last Will and Testament, in which Defendant was appointed executor and trustee of the trusts created thereby. *See* Levine Aff. Ex. L. In his Will, Dr. Dobbs bequeathed two-thirds of his net estate "in equal shares, share and share alike" to Plaintiff and Defendant. *Id.* Following Dr. Dobbs' death, the original Will was filed with the Monroe County Surrogate's Court, however, it was not probated due to insufficient probate assets. *See* McDonald Aff. Ex. X. Plaintiff has received nothing from Dr. Dobbs' estate and has brought the instant action to recover her share of the estate, as well as to recover for emotional harm allegedly inflicted upon her by her inability to see and communicate with her father during the final months of his life.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment shall be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the record in the light most favorable to the nonmovant and resolve all ambiguities and draw all reasonable inferences against the movant. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). "The party against whom summary judgment is sought, however, 'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York*, 957 F.2d 961, 975 (2d Cir. 1992) (quoting *H.L. Hayden Co. of New York, Inc. v. Siemans Med. Sys. Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989)).

## II. <u>Constructive Trust</u>[2]

---

[2] Defendant contends that Plaintiff lacks standing to bring either her constructive trust or fraud claim. *See* Mem. of Law in Supp. of Def.'s Mot. for Summ. J. at 2-3. However, the case law makes clear that she has standing to bring her claim for the imposition of a constructive trust. *See McGovern v. Solomon*, 466 F. Supp. 2d 554, 556-57 (S.D.N.Y. 2006) ("[I]t is implicit that the equitable doctrine of the constructive trust . . . conveys standing upon those who would otherwise have inherited from the decedent.") (internal quotation marks and citations omitted). To the extent that Plaintiff may proceed on her constructive trust claim, this Court sees no reason why she cannot proceed on her fraud claim.

Moreover, the case Defendant cites for the proposition that an estate beneficiary does not have an independent cause of action for the recovery of estate assets notes that this rule is "subject to the exceptions of cases of collusion, of insolvency of the personal representatives, of refusal by them to sue, whether collusively or *bona fide* or of the existence of other special circumstances such as the fraudulent transfer of the trust property by the personal representatives themselves." *McQuaide v. Perot*, 223 N.Y. 75, 79-80 (N.Y. 1918) (internal quotation marks and citations omitted). Subsequent cases have allowed beneficiaries to bring suit for property transferred by a decedent during his or her lifetime where, as here, the executor "is the transferee and claimed wrongdoer." *Greenfield v. Realty Funds, Inc.*, 221 N.Y.S.2d 402, 405 (2d Dep't 1961); *see also Inman v. Inman*, 469 N.Y.S.2d 259 (3d Dep't 1983); *Rolnick v. Rolnick*, 230 N.Y.S.2d 789 (N.Y. Sup. Ct. 1962).

Plaintiff's first claim seeks the imposition of a constructive trust on her share of all of the assets Defendant received in the wake of their father's death, *i.e.*, all monies in the joint accounts, the proceeds from the life insurance policies and the IRA account, and the automobiles. "[A] constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 360 (2d Cir. 1999) (internal quotation marks and citations omitted).

"Under New York law, a party claiming entitlement to a constructive trust must ordinarily establish four elements: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." *In re Koreag, Controle et Revision, S.A.*, 961 F.2d 341, 352 (2d Cir. 1992) (citations omitted). Defendant argues, and Plaintiff disputes, that Plaintiff has failed to establish any of the four elements necessary for the imposition of a constructive trust. But while the factors are helpful guidelines, "constructive trust doctrine is not rigidly limited." *Simonds v. Simonds*, 45 N.Y.2d 233, 241 (N.Y. 1978). Rather, a "constructive trust will be erected whenever necessary to satisfy the demands of justice." *Id.* (internal quotation marks and citation omitted); *see also Koreag*, 961 F.2d at 353 ("New York courts have consistently stressed the need to apply the doctrine with sufficient flexibility to prevent unjust enrichment in a wide range of circumstances.") (citations omitted). "It is agreed that the purpose of the constructive trust is prevention of unjust enrichment. Unjust enrichment, however, does not require the performance of any wrongful act by the one enriched. . . . What is required, generally, is that a party hold property 'under such circumstances that in equity and good conscience he ought not to retain it.'" *Simonds*, 45 N.Y.2d at 242 (citations omitted).

Nonetheless, looking at the four elements of a constructive trust, a familial relationship will ordinarily suffice to satisfy the first element of a confidential or fiduciary relationship. *See Sharp v. Kosmalski*, 40 N.Y.2d 119, 121 (N.Y. 1976); *see also Brand v. Brand*, 811 F.2d 74, 78 (2d Cir. 1987) (confidential relationship between father and son was conceded by son); *Farano v. Stephanelli*, 7 A.D.2d 420, 424 (1st Dep't 1959) ("Such a confidential relationship may exist between parent and child.").

Second, an express promise is not required. An implied promise will suffice. *See Brand*, 811 F2d. at 78; *Sharp*, 40 N.Y.2d at 122 ("Even without an express promise, however, courts of equity have imposed a constructive trust upon property transferred in reliance upon a confidential relationship. In such a situation, a promise may be implied or inferred from the very transaction itself."). "Whether a promise can be inferred from circumstances surrounding the transfer of property is a question of law. Identifying the circumstances that surrounded the transfer, however, involves determinations of factual questions." *Id.* (citation omitted). Here, there exist factual questions as to the circumstances surrounding the creation of the joint accounts – in particular, how Defendant and Dr. Dobbs treated the funds after the creation of the accounts, which could be deemed to imply the existence of a promise. *See generally Brand*, 811 F.2d at 78-79 ("The court found that 'it is clear that all that was intended to be done was to change the appearances and manner in which the property was held, [and] that there was no real substantive change in the way the parties dealt with eachother [sic] or dealt with the father's property.' . . . [T]hese findings . . . adequately support the holding of the court that there was a promise.").

For example, the parties in this case provide conflicting views with respect to the two investment accounts at Chase Investment Services Corp. and whether or not these were accounts of

convenience.[3] Plaintiff contends that these were accounts of convenience and claims, without dispute, that Dr. Dobbs was the sole depositor to the accounts. The Court notes, based on the record presented, that there is no evidence that Defendant ever withdrew from the accounts until Dr. Dobbs fell ill, and then he only did so after exhausting his own funds and consulting with Dr. Dobbs to get his approval. *See* McDonald Aff. Ex. D at 102-03; Def.'s Rule 56.1 Statement ¶ 74; *but see* Alfred John Dobbs II Reply Aff. in Further Supp. of Mot. for Summ. J. ("A.J. Dobbs S.J. Reply Aff." [Doc. # 109]) ¶ 6 (Defendant states generally that he wrote checks from one of the Chase accounts, but gives no specifics as to when or why). In addition, Defendant stated that he did not have check writing privileges for one of the Chase accounts. *See* Levine Aff. Ex. D at 113-14; *but see* A.J. Dobbs S.J. Reply Aff. ¶ 6 (Defendant had the right to deposit and withdraw money, make trades, and write checks from both accounts).

Defendant claims, in contrast, that these were not convenience accounts, but rather, that Dr. Dobbs intended to establish these accounts as true joint tenancies. He contends that while the account statements were mailed to a post office box in Rochester, New York, the post office box was registered in both his and his father's name, and that only he and Dr. Dobbs had access to it. *See* A.J. Dobbs S.J. Reply Aff. ¶ 9. He further asserts that Dr. Dobbs sent him quarterly statements for the two Chase accounts, "which they would review and discuss over the telephone." Def.'s Rule 56.1 Statement ¶ 28; *see also* A.J. Dobbs S.J. Reply Aff. ¶ 9. Defendant claims that 1099 forms were issued in both his and his father's names for these accounts, but that, in accordance with their

---

[3] Regardless of the applicability of N.Y. Banking Law § 675, there are issues of fact as to Dr. Dobbs' intent in creating the joint investment and bank accounts, thereby precluding a grant of summary judgment on this claim.

agreement, Dr. Dobbs reported the income from these accounts on his personal income tax returns. *See* McDonald Aff. Ex. O (Response to Interrogatory 3c).

Raising additional questions is the undisputed fact that the creation of a survivorship interest in the Chase accounts in favor of Defendant is contrary to Dr. Dobbs' testamentary plan, as set forth in his Will, that Plaintiff would receive one-third of his net estate in trust. *See* Levine Aff. Ex. L. Notably, if, as the parties agree, Dr. Dobbs was self-sufficient and capable of taking care of his own finances, then a factual question exists as to why he would have placed virtually all of his assets in joint tenant accounts with Defendant, intending that Defendant receive everything upon his death, but then a few years later, forwarded his Will to Defendant, *see* Levine Aff. Ex. D at 89-92, knowing that the Will called for a distribution of his assets among his estranged wife, Plaintiff, and Defendant. Further issues concerning Dr. Dobbs' intent are raised by evidence in the record that Dr. Dobbs paid for a number of Plaintiff's expenses in the years before he died, *see, e.g.*, Aff. of Rick Olson (charging Plaintiff's car repairs to Dr. Dobbs' credit card); Aff. of James F. Beikirch Ex. H (Dr. Dobbs' check register for 2000 and 2001, evidencing checks made payable to, or on behalf of, Plaintiff ("PL" or "PLD")); Levine Aff. Ex. U (evidencing additional checks made payable to, or on behalf of, Plaintiff ("PL" or "PLD") in 2002, 2003, and 2004), as well as the fact that he told his significant other, Melanie Kain, that he had set up a trust for Plaintiff in his Will. *See* Levine Aff. Ex. C at 17.[4]

---

[4]Because the Chase accounts comprised almost all of Dr. Dobbs' assets upon his death, the parties spend little time addressing the other assets at issue, *i.e.*, the bank accounts, the automobiles, the life insurance policies, and the IRA account. To the extent that the greater part of these transactions – creating the joint bank accounts, conveying joint ownership of the automobiles, and designating Defendant the sole beneficiary of the life insurance policies and IRA account – occurred in or around the same time period, the Court finds that the same issues of fact regarding Dr. Dobbs' intent apply to them as well.

Third, to the extent that there are issues of fact regarding whether a promise was made, there are also issues of fact regarding whether a transfer of funds was made in reliance on that promise.

Fourth, with respect to unjust enrichment,

> A constructive trust may be imposed even though the transferee fully intended to perform his promise at the time of the conveyance. Actual fraud or undue influence need not be shown. The subsequent abuse of the confidential relation constitutes a sufficient fraud to call upon the remedial powers of a court of equity.
>
> A conclusion that one has been unjustly enriched is essentially a legal inference drawn from the circumstances surrounding the transfer of property and the relationship of the parties.

*Brand*, 811 F.2d at 80-81 (internal quotation marks and citations omitted). Therefore, the determination of whether Defendant was unjustly enriched depends upon the resolution of the aforementioned issues of fact regarding the circumstances under which Dr. Dobbs transferred to Defendant a joint interest in, and/or named him the sole beneficiary of, his assets.

Based on the foregoing, a grant of summary judgment on Plaintiff's claim for the imposition of a constructive trust would be inappropriate.

### III. Conversion

"[T]o establish a cause of action in conversion, the plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights. Tangible personal property or specific money must be involved." *Independence Disc. Corp. v. Bressner*, 365 N.Y.S.2d 44, 45 (2d Dep't 1975) (citations omitted). As noted in Section II., *supra*, issues of fact remain with respect to whether Dr. Dobbs' assets were being held by Defendant in constructive trust for Plaintiff. Therefore, there are

issues of fact regarding Plaintiff's "legal ownership" or "immediate superior right of possession" to her share of these assets, and summary judgment would be inappropriate with respect to her conversion claim.

IV. **Fraud**

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (citation omitted). In this case, Plaintiff alleges that Defendant defrauded her by fraudulently inducing Dr. Dobbs to make him a joint tenant on all of his accounts[5] while knowing that he would not respect Dr. Dobbs' testamentary intent upon his death. However, there is no evidence in the record to support the contention that Defendant made a misrepresentation or omission of material fact at the time that either any of the joint accounts were created, Defendant was named the sole beneficiary of the life insurance policies or IRA account, or Defendant became a joint owner of the automobiles. All of this had been done years before Dr. Dobbs fell ill and before Defendant knew about Dr. Dobbs' Will (although it is unclear on the record presented when, in fact, Defendant found out what the terms of the Will were). *See* Levine Aff. Ex. D at 89-92; Pl.'s Rule 56.1 Statement ¶ 60 ("Dr. Dobbs, four years before his death, mail[ed] to Defendant a sealed envelope containing a copy of Dr. Dobb's [sic] will and the combination to his home safe with instructions not to open the will until Dr. Dobb's [sic] death . . ."); *but see* McDonald Aff. Ex. D

---

[5]Plaintiff does not mention the life insurance policies, the IRA account, or the automobiles in connection with her fraud claim, but the Court will assume that she is asserting her claim as to these assets as well.

12

at 103 ("[M]y father wanted me to contact Mitchell Chait. And I did meet with Mitchell and I got another copy of my father's will to verify that I had the most recent will . . .").[6] Therefore, summary judgment is appropriate on Plaintiff's fraud claim insofar as it relates to alleged estate assets.

In addition, Plaintiff bases her fraud claim on allegations that Defendant prevented her from seeing or communicating with her father during the final months of his life. *See* Second Am. Compl. ¶¶ 29-43. As a result, she "suffered and continues to suffer emotional trauma caused by the inability to visit or talk with her Father in his final year of life." *Id.* ¶ 44. Nevertheless, in fraud cases, plaintiffs can only recover damages for actual pecuniary losses, *see Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir. 1993), not emotional injury. *See Sheahan v. CBS Inc.*, No. 92 CIV. 6197, 1994 WL 74836, at *10 (S.D.N.Y. Mar. 8, 1994) (citations omitted). Therefore, summary judgment on Plaintiff's fraud claim, insofar as it is based on an inability to visit or communicate with her father during the final months of his life, is appropriate as well. *See id.* (granting summary judgment on fraud claim where plaintiff could show no compensable injury in reliance on promise by defendant).

V. **Intentional Infliction of Emotional Distress**

To state a claim for intentional infliction of emotional distress, a plaintiff must allege "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 121 (N.Y. 1993). The conduct must be so outrageous and extreme "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 122 (internal

---

[6]Moreover, there is no evidence that Dr. Dobbs would have changed his account designations, his life insurance or IRA beneficiaries, or the ownership of his automobiles but for a misrepresentation or omission of material fact made by Defendant.

13

quotation marks and citations omitted). Plaintiff's claim is based on allegations that Defendant prevented her from seeing or communicating with her father in the final months of his life. *See, e.g.,* Pl.'s Rule 56.1 Statement ¶¶ 43-45. She claims that Defendant purposely misinformed her that she could only visit Dr. Dobbs at the nursing facility if accompanied by Defendant and that when Plaintiff tried to arrange visits, Defendant was uncooperative. Plaintiff additionally claims that Defendant intentionally cut off her father's financial support of Plaintiff, "causing her dire financial distress and eviction from her apartment." Mem. in Opp'n to Def's Mot. for Summ. J. at 23. Defendant argues that Plaintiff's claim lacks either a legal or factual basis since the conduct complained of was not sufficiently outrageous; moreover, he asserts that there is no proof that Plaintiff suffered extreme emotional distress during the final months of her father's life as a result of Defendant's conduct.

To begin, to the extent that Plaintiff is basing her intentional infliction of emotional distress claim on allegations that Defendant intentionally inflicted financial distress upon her, *see, e.g.,* Second Am. Compl. ¶ 59 (Defendant "tortiously interfered with Plaintiff's inheritance from Father"), such a claim will not lie, since the conduct complained of is actionable through the use of traditional tort remedies. *See, e.g., Roper v. Hynes,* No. 05 Civ. 7664, 2006 WL 2773032, at *13 (S.D.N.Y. Sept. 27, 2006). Here, Plaintiff's allegations of interference with her rights to her share of her father's assets are subsumed within her conversion claim. *See Lenhoff v. Getty,* 97 Civ. 9458, 2000 U.S. Dist. LEXIS 9835, at *24 (S.D.N.Y. July 17, 2000) (no claim for intentional infliction of emotional distress where conduct was covered under conversion claim).

Insofar as Defendant's other conduct is concerned, "it is well settled that one of the elements of the tort of intentional infliction of emotional distress is that the victim be shown to have suffered

*severe* psychological damage. This element must be established to make out liability and does not go merely to damages." *Richard L. v. Armon*, 536 N.Y.S.2d 1014, 1016 (2d Dep't 1989) (emphasis in original) (citations omitted). "In proving the fourth element – severe emotional distress – the plaintiff must support her contention with 'medical evidence, not just the mere recitation of speculative claims.'" *Bujnicki v. Am. Paving & Excavating, Inc.*, No. 99-CV-646S, 2004 WL 1071674, at *14 (W.D.N.Y. Mar. 30, 2004) (quoting *Walentas v. Johnes*, 683 N.Y.S.2d 56, 58 (1st Dep't 1999)).[7] In this case, while it is undisputed that Plaintiff suffered from clinical depression throughout much of her life, she fails to provide any proof that she suffered additional severe emotional distress during the final months of her father's life due to any actions Defendant allegedly took to prevent her from seeing or communicating with him. *See* Levine Aff. Ex. Q. The medical records for July, August, September, and October 2005 all note that brother was "supportive," and the medical record from October 31, 2005, after Dr. Dobbs' death, states, "Pt. reports being close to her brother . . ." *Id.* None of the medical records for that time period – or any subsequent time period – indicate that Plaintiff was distressed due to an inability to see, or communicate with, her father.

It is not until the end of November 2005 that the medical records indicate conflict between Plaintiff and Defendant. The report for November 29, 2005 from Plaintiff's treating psychiatrist, Dr. Alexander Koleszar, states under "Stressor Update," "Pt believes that her brother stole money from

---

[7]Even if this Court were to find that the production of medical evidence of emotional injury is not a prerequisite to the maintenance of a claim for intentional infliction of emotional distress, *see Sylvester v. City of New York*, 385 F. Supp. 2d 431, 444 (S.D.N.Y. 2005) ("Although in some cases, lack of medical evidence was held to be a sufficient ground for granting a motion for summary judgment, courts have also held that medical evidence is not a prerequisite to IIED claims.") (comparing cases), in this case, Plaintiff has produced such medical evidence, and the Court finds that it fails to support her claim.

15

father's estate - mother sued him - now pt has to sue for her third of estate as specified in Will." *Id.* Under "Progress" it states, "Still grieving, now complicated further by family conflict.... Ironically, somewhat closer to mother as a result. Continues to feel more overwhelmed than usual secondary to, and in proportion to stressors." *Id.* Under "MSE" it states, "Mood dysphoric/sad, but still coping," and under "Assessment/Plan" it states, "Chronic depression and anxiety, still somewhat exacerbated due to stressors." *Id.* But by her January 23, 2006 visit, Dr. Koleszar noted in his report Plaintiff's comment, "I have to admit that overall things are stable." *Id.*

Subsequent medical reports indicate emotional problems due to the onset of pre-menopause, Plaintiff's living situation, the illness of her cat, and continued financial strain. *Id.* However, despite these problems and stressors, the record presented on this motion does not support Plaintiff's claim regarding the severity of her emotional distress, nor that it resulted from Defendant's alleged conduct in preventing her from seeing or communicating with her father in the final months of his life. As of his August 28, 2006 report, Dr. Koleszar noted under "Assessment/Plan", "Chronic depression and anxiety, though fueled by recent stressors, pt has be[en] doing reasonably well." Levine Aff. Ex. Q. This assessment appeared in his September and October 2006 reports as well. *See id.* And in his affidavit, Dr. Koleszar concluded, "It is *possible, though not predictable*, that Pamela Dobbs' risk of suicidal ideation would increase if financial, economic, legal, and family stressors in her life are not reduced." Koleszar Aff. ¶ 44 (emphasis added); *see also id.* ¶ 21 ("In my professional opinion if the litigation came to a conclusion, and the Plaintiff had fewer financial fears it is possible, though not predictable, that patient's depressed mood and likelihood [of] suicidal ideation would diminish.").

16

Notably, from both the medical records, Levine Aff. Ex. Q, as well as Dr. Koleszar's affidavit, it is apparent that financial strain was the predominant stressor Plaintiff experienced both right before, as well as after, the death of her father, which in and of itself was a stressor. However, as explained above, any such strain caused by Defendant's conduct falls within the ambit of Plaintiff's conversion claim.

Where, as here, there is nothing in the record to support Plaintiff's claim regarding the severity of her emotional distress, beyond what she experienced as a result of already suffering from clinical depression, a grant of summary judgment on her claim for intentional infliction of emotional distress is appropriate. *See Bujnicki*, 2004 WL 1071674, at *15 ("Nothing in the record supports Plaintiff's claim regarding the severity of her condition. As such, this Court finds that no reasonable jury could consider the evidence presented and conclude that Plaintiff suffered any severe emotional distress.") (citation omitted); *see also Lenhoff*, 2000 U.S. Dist. LEXIS 9835, at *24-*25 (summary judgment granted where plaintiff offered "scant evidence that she actually suffered severe emotional distress").[8]

### VI. Negligent Infliction of Emotional Distress

A claim for negligent infliction of emotional distress "must be premised 'upon the breach of a duty owed to plaintiff which either unreasonably endangers the plaintiff's physical safety, or causes the plaintiff to fear for his or her own safety.'" *Lee v. McCue*, 410 F. Supp. 2d 221, 227 (S.D.N.Y. 2006) (quoting *Sheila C. v. Povich*, 781 N.Y.S.2d 342, 351 (1st Dep't 2004)), *appeal dismissed*, 218

---

[8]While the instant case is distinguishable from *Lenhoff* in that Plaintiff here has provided medical evidence, as well as an affidavit from her psychiatrist, the Court nonetheless finds that this evidence fails to support her claim that she suffered "severe emotional distress" due to Defendant's alleged conduct such that a jury could find in her favor.

F. App'x 26 (2d Cir. 2007). Even assuming *arguendo* that Defendant breached an alleged fiduciary duty of care to Plaintiff by preventing her from visiting her father in the final months of his life, *see* Second Am. Compl. ¶¶ 62-63, there is no proof that this conduct either unreasonably endangered Plaintiff's physical safety or caused Plaintiff to fear for her safety. *See* Levine Aff. Ex. Q (medical records); Koleszar Aff.

## **CONCLUSION**

For the foregoing reasons, I respectfully recommend that your Honor grant in part and deny in part Defendant's motion for summary judgment as set forth herein.

## **NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Rule 72(b), Fed. R. Civ .P., the parties shall have ten (10) days, plus an additional three (3) days, pursuant to Rule 6(e), Fed. R. Civ. P., or a total of thirteen (13) working days, (*see* Rule 6(a), Fed. R. Civ. P.), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Kenneth M. Karas, at the United States Courthouse, 300 Quarropas Street, Room 533, White Plains, New York 10601, and to the chambers of the undersigned at Room 434, 300 Quarropas Street, White Plains, New York 10601.

Failure to file timely objections to the Report and Recommendation will preclude later appellate review of any order to judgment that will be entered by Judge Karas. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825 (1992);

*Small v. Secretary of H.H.S.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); *Wesolek v. Canadair, Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988). Requests for extensions of time to file objections must be made to Judge Karas and should not be made to the undersigned.

Date: January 2, 2008
White Plains, New York

Respectfully submitted,

_____
MARK D. FOX
UNITED STATES MAGISTRATE JUDGE